## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

```
------------------------------------------------------ x
                                        :
                                        :
JONATHAN IMHOFF and                     :
GLEN AURELIUS,                          : Civil Action No. _____
on behalf of themselves                 :
and all others similarly situated,      :
                                        :
                                        : CLASS- AND COLLECTIVE-
            Plaintiffs,                  : ACTION COMPLAINT
                                        :
        v.                              :
                                        : Jury Trial Demanded
WEATHERFORD INTERNATIONAL               :
LLC; WEATHERFORD U.S., L.P.;            :
and WEATHERFORD                         :
INTERNATIONAL PLC,                      : Electronically Filed
                                        :
                                        :
            Defendants.                  :
------------------------------------------------------ x
```

## CLASS- AND COLLECTIVE-ACTION COMPLAINT

### NATURE OF THE ACTION, JURISDICTION, AND VENUE

1.    This is an individual and collective action under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 207(a) & 216(b), and an individual and class action under the Pennsylvania Minimum Wage Act (PMWA), 43 P.S. §§ 333.104(c) & 333.113, to recover damages for non-payment of overtime compensation owed to Plaintiffs and all others similarly situated.

2.    Jurisdiction of this court is invoked under 28 U.S.C. § 1331.  This action is authorized and instituted under the FLSA.

3.    A substantial part of the events and omissions giving rise to these claims occurred in the

Western District of Pennsylvania, where Plaintiffs regularly worked during the relevant timeframe and where Defendants have regularly conducted fracking operations. Therefore, this action is within the jurisdiction of, and venue is proper in, the United States District Court for the Western District of Pennsylvania.

## PARTIES

4.    **Plaintiff Jonathan Imhoff** resides in Pittsburgh, Pennsylvania. Plaintiff Imhoff worked for Defendants from July 2014 through February 2015.

5.    **Plaintiff Glen Aurelius** resides in Plain City, Ohio.  Plaintiff Aurelius worked for Defendants from August 2009 until October 2012, and again from November 2013 until December 2014.

6.    **Defendant Weatherford International LLC** is a limited liability company organized under the laws of Delaware. Defendant Weatherford International LLC maintains its principal place of business at 2000 St. James Place, Houston, Texas 77056. Defendant Weatherford International LLC is a wholly owned subsidiary of Defendant Weatherford International plc.

7.    **Defendant Weatherford U.S., L.P.** is a limited partnership that maintains its principal place of business at 515 Post Oak Boulevard, Suite 600, Houston, TX 77027.  Defendant Weatherford U.S., L.P. is a wholly owned subsidiary of Defendant Weatherford International plc.

8.    **Defendant Weatherford International plc** is a public limited company that is incorporated under the laws of Ireland.  Defendant Weatherford International plc maintains its principal place of business at 2000 St. James Place, Houston, Texas 77056. Defendant Weatherford International plc also maintains a place of business at 2911 Reach Road, Williamsport, PA 17701.

9.      Defendant Weatherford International plc became the parent corporation of the Weatherford group of companies in June 2014, when non-party Weatherford International Ltd. changed its place of incorporation from Switzerland to Ireland.

10.     Plaintiffs worked for Defendant Weatherford U.S., L.P., Defendant Weatherford International LLC, and Defendant Weatherford International plc, or for predecessors of those companies. Defendants were joint employers of Plaintiffs and/or have successor liability for the claims asserted in this complaint.

11.     Defendant Weatherford International plc (including its subsidiaries) is one of the largest providers of oil and natural gas services and products in the world, including products and services related to drilling, production, and intervention of oil and natural gas wells.

12.     At all relevant times Defendants have engaged in interstate commerce.

13.     At all relevant times Defendants' annual revenues have exceeded $500,000.

14.     At all relevant times each Defendant has been subject to the minimum wage and overtime provisions of the FLSA.

## STATEMENT OF CLAIMS

15.     Plaintiff Imhoff worked as a service supervisor for Defendants from July 2014 until February 2015.

16.     Plaintiff Aurelius worked for Defendants from August 2009 until October 2012, and again from November 2013 until December 2014.  From August 2009 until October 2014, Plaintiff Aurelius held the job title of service supervisor.  In October 2014 Defendants promoted Plaintiff Aurelius to the position of field supervisor.

17.     Plaintiffs reported to Defendants' field office in Buckhannon, West Virginia, but Plaintiffs spent virtually no time at that field office; Plaintiffs worked at the Buckhannon field office no more than one day per month.

18.     While Plaintiffs worked for Defendants, Plaintiffs spent about 99% of their time working at natural gas well sites, most of which were in western Pennsylvania and Ohio.

19.     Plaintiff Aurelius also worked at job sites in West Virginia, but Plaintiff Imhoff never worked at a job site in West Virginia.

20.     Defendants paid Plaintiffs an annual salary of roughly $71,000, plus a per-day bonus of $250 for each day Plaintiffs worked at a well site.

21.     Defendants perform hydraulic fracturing ("fracking") operations at natural gas well sites all over the United States.  These well sites are owned and operated by other energy companies that hire Defendants to perform the fracking operations.

22.     "Fracking" is the process of drilling natural gas wells in the ground and then injecting sand and fluids into the wells at very high pressure in order to fracture subterranean shale rocks and release natural gas trapped under those rocks.

23.     At any given time, Defendants employed between six and ten other service supervisors who reported to Defendants' field office in Buckhannon, West Virginia.

24.     Defendants also employed between nine and fifteen service supervisors who reported to Defendants' field office in Muncy, Pennsylvania.

25.     Over the past three years, Defendants have employed at least thirty different people as service supervisors at the Buckhannon and Muncy field offices.

26.   All of the service supervisors who reported to Defendants' Buckhannon and Muncy field offices performed work at well sites in Pennsylvania.

27.   Plaintiffs and the other service supervisors reported to Defendants' field supervisors, operations supervisors, and district manager.

28.   Each of Defendants' field supervisors was responsible for one of Defendants' fracking "fleets," and the field supervisors traveled back and forth between the field office and the job sites to supervise the fracking crews and monitor the equipment.

29.   Unlike the service supervisors, the field supervisors and operations supervisors did not spend their entire workdays at one specific well site.  The field supervisors typically worked at the well sites when the crew was "rigging up" or "rigging down" the fracking equipment, and the field supervisors would stay at the well sites when the client insisted on their presence, when the service supervisor was absent, and in other circumstances.

30.   The operations supervisors and district manager worked from Defendants' field offices.

31.   Form their field offices in Buckhannon and Muncy, Defendants provide fracking services to many different energy companies at many different well sites throughout Pennsylvania, Ohio, and West Virginia.

32.   When Defendants perform fracking services for their clients, Defendants send a fracking crew and one or two service supervisors to the client's well site.

33.   Each fracking crew includes about eight to ten people who are called "equipment operators."  The fracking crew operates the equipment used to perform fracking services.

34.   Defendants' service supervisors, including Plaintiffs, act as the liaison between

Defendants' fracking crewmembers and the client representative in charge of a particular well site, who is known as the "company man."

35.  While Plaintiffs worked for Defendants, Plaintiffs worked at several different job sites, each of which was supervised and operated by a different company man, and Plaintiffs worked for several different clients.

36.  Irrespective of the particular client for which Plaintiffs worked, and irrespective of the particular job site at which Plaintiffs worked, Plaintiff's job duties and managerial authority did not vary.

37.  On a typical day, Defendants' service supervisors, including Plaintiffs, would travel to their respective job sites with the other members of their fracking crews, and upon arrival the fracking crew would hold a safety meeting, which the company man would attend.

38.  Defendants imposed general safety requirements on their fracking crews, and Defendants' clients also imposed their own safety requirements on the fracking crews who worked at their well sites.

39.  The service supervisors did not devise their own safety requirements or protocols, and the service supervisors were not responsible for devising Defendants' safety policies and practices.

40.  At the daily safety meetings, the service supervisors reminded the fracking employees of the safety requirements imposed by Defendants and their clients.

41.  After the safety meeting, the fracking crew operates the fracking machinery, which includes the slurry blender and the fracking pumps.

42.  While the fracking crewmembers operate the fracking machinery, the service supervisor

sits in the client's "data van" with the company man and an engineer.  In the data van the engineer measures and tracks the pressure in the natural gas well while the company man and the service supervisor monitor the fracking operations.

43.     The client's representative (the company man) is responsible for managing and supervising all operations at the well site, and the company man makes all operational decisions; the company man has total control over the workplace operations at each well site.

44.     Defendants' service supervisors are not authorized to make operational decisions, and neither Plaintiffs nor the other service supervisors made any decisions with respect to the daily operations at the well sites.

45.     At the beginning of each workday, the company man plans the work and then meets with the service supervisor to provide the general work instructions for that day, and the service supervisors conveyed those work orders to the fracking crewmembers.

46.     Throughout the workday, the company man provided updated work instructions to the service supervisor, and the service supervisor relayed those instructions to the fracking crewmembers.  The company man was responsible for directing the work of the fracking crewmembers, and the service supervisors merely act as conduits through which those work instructions are relayed.

47.     As a general matter, the fracking crewmembers were not permitted to interact with the company man.   All communications between the fracking crewmembers and the company man were channeled through the service supervisor, and the primary role of the service supervisor was to act as the intermediary between the company man and the fracking crewmembers.

48.     Whenever the fracking crew experiences any kind of problem, the company man decides

how to address and resolve the problem.  The service supervisor does not participate in that decision.

49.     Whenever the company man makes an operational decision, Defendants' service supervisors, including Plaintiffs, were responsible for relaying that decision to the fracking crew over the radio.

50.     The other role performed by the service supervisors was to keep Defendants' field supervisors, operations supervisors, and other managers apprised of the events that transpired at the well sites each day so that Defendants' managers could maintain client relationships and oversee the fracking operations.

51.     Defendants' service supervisors also send emails throughout the workday to Defendants' managers at the Buckhannon and Muncy field offices and to the field supervisors who travel around between the various well sites at which Defendants are performing fracking services.  The purpose of these emails is to advise the managers and field supervisors about what was happening at the well site, what problems had occurred during the day, and what the fracking crew had accomplished during the day.

52.     Each day that Defendants' fracking crews work at a well site, information about the job is recorded on a "job ticket." The service supervisor does not fill out the job ticket; rather, the engineer is responsible for filling out the job ticket.

53.     Defendants also use spreadsheets to track the amount of fuel used by the fracking machinery each day.  Although service supervisors could assist with this paperwork, the engineer generally was responsible for completing the fuel-use paperwork.

54.     Plaintiffs and the other service supervisors did not decide what materials, supplies, machinery, equipment, or tools would be used at a particular job site, nor did Plaintiffs and the other service supervisors decide what materials, supplies, machinery, equipment,

or tools would be used on a given day.  Those decisions were made by the operations supervisor in conjunction with the company man.

55.     Plaintiffs and the other service supervisors provided no input with respect to the machinery and equipment purchased by Defendants.

56.     When Defendants considered purchasing new equipment or machinery, such as when Defendants considered expanding their fracking operations, Defendants did not consult Plaintiffs or the other service supervisors.

57.     Plaintiffs and the other service supervisors did not hold a company credit card, and Plaintiffs and the other service supervisors were not authorized to purchase significant supplies and equipment without the prior authorization of the operations supervisor.

58.     Plaintiffs and the other service supervisors sometimes purchased small tools that cost less than $100, but the service supervisors were required to pay for those tools out of pocket and to seek reimbursement from Defendants.

59.     Even when the service supervisors purchased small tools, the service supervisors were required to contact the operations supervisor to obtain permission for the purchase.

60.     Plaintiffs and the other service supervisors at Defendants' Buckhannon and Muncy field offices were not authorized to discipline fracking crewmembers.

61.     Defendants' managers and field supervisors were the only people authorized to discipline the fracking crewmembers.

62.     Plaintiffs and the other service supervisors were not authorized to "write up" fracking crewmembers for misconduct; rather, the service supervisors were required to report instances of misconduct by a fracking crewmember to the field supervisors or managers,

who were responsible for deciding whether to write up or otherwise discipline the fracking crewmember.

63.    If Plaintiffs wanted to send a fracking crewmember home due to poor performance or lack of punctuality, Plaintiffs had to obtain the permission of the operations supervisor.

64.    Plaintiffs and the other service supervisors did not handle grievances or complaints from the fracking crewmembers.   Although Plaintiffs and the other service supervisors sometimes received informal grievances from the fracking crewmembers, Plaintiffs and the other service supervisors could not resolve those grievances.   The grievances had to be referred to, and resolved by, the operations supervisor.

65.    On any given day, the fracking crews that reported to Defendants' Buckhannon and Muncy field offices performed fracking operations at five different job sites.

66.    Plaintiffs and the other service supervisors did not assign fracking crewmembers to specific fracking crews, and the service supervisors did not decide where each fracking crew would work each day.   Defendants' operations supervisors made those decisions.

67.    Plaintiffs and the other service supervisors did not control the hours worked by the fracking crewmembers and did not set their schedules.

68.    Defendants' operations supervisors controlled the work schedules and hours of the fracking crewmembers.

69.    There was one equipment operator who was designated as the "assessor," and that person was trained and qualified to assess the performance of the other equipment operators.

70.    The assessor completed paperwork to track the performance of fracking crewmembers, and the assessor made recommendations to the operations supervisor with respect to

salary increases and promotions.

71.     The field supervisors, operations supervisors, and district manager made all decisions with respect to promotions.

72.     Plaintiffs and the other service supervisors were not empowered to promote fracking crewmembers, and they did not provide suggestions or recommendations with respect to the promotion of fracking crewmembers.

73.     Plaintiff Imhoff recommended a fracking crewmember for a promotion on only one occasion, and the operations supervisor disregarded Plaintiff Imhoff's advice and did not promote the crewmember.

74.     The service supervisors did complete periodic, objective performance evaluations of the fracking crewmembers to ensure that the crewmembers were able to operate the equipment. The field supervisors used these objective assessments to track attendance and errors and to verify whether certain crewmembers were able to operate more complex pieces of equipment, which was relevant to determining whether the crewmember could be promoted (such as from Equipment Operator II to Equipment Operator III).  But the service supervisors did not make promotion recommendations; they only provided the objective assessments, and the field supervisors, operations supervisors, and district manager used the objective assessments to evaluate performance and make decisions about promotions.

75.     Plaintiffs and the other service supervisors played no role whatsoever in Defendants' hiring processes, including the interview and selection processes; Defendants' operations supervisors and other senior managers made all hiring decisions.

76.     Plaintiffs and the other service supervisors were not authorized to fire any employees, and the service supervisors played no role in the decision whether to fire an employee.

77.     The service supervisors were responsible for reporting misconduct, but they did not decide how to respond to the misconduct.

78.     Plaintiffs and the other service supervisors were not authorized to award vacation days or other leave to the fracking crewmembers.

79.     When a fracking crewmember wanted to take vacation, or when a fracking crewmember needed to take leave for another purposes, such as bereavement, the service supervisors were instructed to contact the operations supervisor, who would then contact the crewmember to address the request for leave.

80.     Plaintiffs and the other fracking supervisors exercised no authority or control over the wages paid to the fracking crewmembers.

81.     The operations supervisors and other senior managers who worked for Defendants made all compensation decisions.

82.     Plaintiffs and the other service supervisors neither planned nor controlled the budget, and they provided no input concerning budgetary decisions.

83.     The budget was controlled and planned by Defendants' operations supervisors and other senior managers and officers.

84.     Employees who worked at Defendants' Buckhannon and Muncy field offices would review the job tickets and timesheets submitted by the fracking crewmembers, and those office workers ensured that fracking crewmembers were not taking unauthorized leave.

85.     Plaintiffs and the other service supervisors who reported to Defendants' Buckhannon and Muncy field offices worked an "eight and four" schedule, which means they worked for

eight straight days, followed by four days off.

86.    Each day Defendants assigned two fracking crews to each well site, and the fracking operations at each well site continued around the clock, twenty-four hours per day.

87.    Each fracking crew worked a twelve-hour shift at the well site, and the fracking crews also spent up to four hours each day traveling to and from the well sites, which was deemed compensable work time.

88.    Plaintiffs and the other service supervisors sometimes worked up to twenty hours at the well site in a single workday, such as when they were "rigging up" the fracking machinery.

89.    Plaintiffs and the other service supervisors regularly worked more than 90 hours per week, and Plaintiffs and the other service supervisors sometimes worked as many as 120 hours in a single workweek.

90.    Defendants classified Plaintiffs and the other service supervisors at the Buckhannon and Muncy field offices as "exempt" from the FLSA's overtime requirements.

91.    Defendants did not pay Plaintiffs and the other service supervisors at the Buckhannon and Muncy field offices any overtime premium pay whenever they worked more than forty hours in a single workweek.

92.    Although Defendants have not paid overtime compensation to Plaintiffs and the other service supervisors at the Buckhannon and Muncy field offices, Defendants have paid overtime compensation to some service supervisors who work at Defendants' other field offices, and Defendants have classified some other service supervisors as "non-exempt" under the FLSA.

93.     Those service supervisors at Defendants' other field offices who are classified as non-exempt and who receive overtime compensation perform the same job duties, and have the same job responsibilities, as the service supervisors who work at Defendants' field offices in Buckhannon and Muncy.

94.     Since at least April 2012, Defendants have known that their failure to pay overtime compensation to Plaintiffs and the other service supervisors at the Buckhannon and Muncy field offices constitutes a violation of the FLSA.

95.     Since at least April 2012, Defendants have acted in reckless disregard of the FLSA when they refused to compensate Plaintiffs and the other service supervisors at the Buckhannon and Muncy field offices at one-and-one-half times their regular rate of pay for all hours above forty that they worked in a single workweek.

## CLASS- AND COLLECTIVE-ACTION AVERMENTS

96.     This is a "hybrid" action that may be maintained as an individual action, as a collective action under the FLSA, 29 U.S.C. § 216(b), and as a class action under Federal Rule of Civil Procedure 23.  *See Knepper* v. *Rite Aid Corp.*, 675 F.3d 249 (3d Cir. 2012).

97.     The FLSA collective and the Rule 23 class are coextensive and include all persons who were employed as fracking service supervisors and who reported to Defendants' field office in Buckhannon, West Virginia, or Muncy, Pennsylvania, at any time in the past three years.

98.     All of the service supervisors who reported to Defendants' Buckhannon and Muncy field offices performed substantial work in Pennsylvania, and accordingly all members of the class are protected by the PMWA.

99.     Prosecuting this case as a class action will promote judicial efficiency and will best

protect the interests of the class members because the service supervisors at the Buckhannon and Muncy field offices performed the same job duties and had the same level of managerial authority, so their entitlement to overtime compensation can and should be determined on a class-wide basis.

100. There are no conflicts of interest among the class members, nor do Plaintiffs have any conflicts of interest with any member of the class.

101. Plaintiffs will fairly and adequately represent the interests of the class.

102. Counsel for Plaintiffs and the class is experienced in the fields of employment law, FLSA collective actions, and class-action litigation, and counsel will fairly and competently represent the interests of the class.

103. Members of the class are so numerous that joinder of all members is impractical, as Plaintiffs estimate that the class includes at least thirty persons who currently reside in many different states.

104. There are questions of fact and law common to all members of the class: All members of the class had the same job duties, all members of the class played no role in hiring and firing decisions, all members of the class were denied overtime compensation, all members of the class received the same type of compensation, and all members of the class reported to the same managerial structure.

105. Plaintiffs' claims are typical of the class, as the class is narrowly drawn to include service supervisors who reported to just two field offices and who worked at job sites in Pennsylvania.

106. A class action provides a fair and efficient method for adjudication of this controversy.

107.   Prosecuting this case as individual actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

108.   Questions of fact and law common to the class predominate over any questions affecting only individual members, as members of the class performed the same job duties but were denied overtime compensation by Defendants.

109.   A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

110.   Members of the class have no interest in individually controlling the prosecution of these claims.

111.   This is an appropriate forum in which to litigate these claims on behalf of the class because all members of the class worked at well sites in this district, Defendants have regularly conducted business in this district, and this district is halfway between the field offices in Buckhannon and Muncy. Because members of the class worked at well sites in Ohio, West Virginia, and Pennsylvania, this district is also the midpoint of the job sites where members of the class worked during the class period, so it is the most convenient place to litigate these claims.

112.   This class action presents straightforward questions of law and therefore will not be difficult to manage.

## <u>COUNT I:  VIOLATION OF THE FLSA</u>
### <u>Individual and Collective Action</u>

113.   Plaintiffs hereby incorporate by reference the preceding paragraphs of this complaint.

Page 16 of 19

114.   Plaintiffs and all others similarly situated were employees of Defendants within the meaning of the FLSA.

115.   Defendants were employers within the meaning of the FLSA.

116.   Defendants misclassified Plaintiffs and all others similarly situated as exempt from the overtime provisions of the FLSA.

117.   Defendants' failure to pay Plaintiffs and all others similarly situated at one-and-one-half times their regular rates of pay for hours above forty that they worked in certain workweeks constituted a violation of the FLSA.

118.   Plaintiffs and all others similarly situated are entitled to recover from Defendants the overtime pay improperly withheld by Defendants, plus interest, attorneys' fees, and costs.

119.   Plaintiffs and all others similarly situated are also entitled to recover liquidated damages equal to the amount of overtime compensation improperly withheld.

## COUNT II:  VIOLATION OF THE PMWA
### Individual and Class Action

120.   Plaintiffs hereby incorporate by reference the preceding paragraphs of this complaint.

121.   Plaintiffs and members of the class were employees of Defendants within the meaning of the PMWA.

122.   Defendants were employers within the meaning of the PMWA.

123.   Defendants misclassified Plaintiffs and members of the class as exempt from the overtime provisions of the PMWA.

124.   Defendants' failure to pay Plaintiffs and members of the class at one-and-one-half times their regular rates of pay for hours above forty that they worked in certain workweeks constituted a violation of the PMWA.

125.   Plaintiffs and members of the class are entitled to recover from Defendants the overtime pay improperly withheld by Defendants, plus interest, attorneys' fees, and costs.

## PRAYER FOR RELIEF

126.   WHEREFORE, Plaintiffs and all members of the class and the collective respectfully request that this Court:

   A.  order Defendants to pay money damages equal to the unpaid overtime compensation owed to Plaintiffs and members of the class and collective;

   B.  order Defendants to pay liquidated damages equal to the unpaid overtime compensation owed to Plaintiffs and members of the collective;

   C.  order Defendants to pay the litigation costs and reasonable attorneys' fees incurred by Plaintiffs and members of the class and collective; and

   D.  grant such further relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

127.   Plaintiffs request a jury trial on all issues raised in the complaint.

Respectfully submitted,

 s/Joseph H. Chivers

Joseph H. Chivers, Esq.
PA ID No. 39184
First & Market Building
Suite 1010
100 First Avenue

Pittsburgh, PA  15222-1514
jchivers@employmentrightsgroup.com
(412) 227-0763/FAX (412) 281-8481

*Counsel for Plaintiffs*
*and all others similarly situated*

Dated: <u>May 26, 2015</u>